***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly named in the above-captioned file name; all parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North CarolinaWorkers' Compensation Act.
3. All parties are properly designated, and there is no question as to joinder or non-joinder of parties.
4. Employee-Plaintiff's average weekly wage is $851.03, yielding a weekly compensation rate of $567.38.
5. Employee-Plaintiff received partial payment for days missed from work and partial payment of medical expenses and treatment.
6. Defendants paid the entire mediator's fee arising from the Commission Ordered Mediated Settlement Conference in the above-captioned claim, totaling $832.50, and Defendants are entitled to a credit of $416.25 against any benefits that may be awarded to Employee-Plaintiff.
7. Defendants supplemented the evidentiary record with the following documents, which the parties stipulated as being admissible:
 a. Employee-Plaintiff's answers to Defendants' First Set of Interrogatories, marked as Defendants' Stipulated Exhibit 1
 b. Employee-Plaintiff's answers to Defendants' Second Set of Interrogatories, marked as Defendants' Stipulated Exhibit 2;
 c. Employee-Plaintiff's personnel file, marked as Defendants' Stipulated *Page 3 
Exhibit 3;
 d. Nurse case management records, marked as Defendants' Stipulated Exhibit 4.
8. Employee-Plaintiff supplemented the evidentiary record with the following documents, which the parties stipulated as being admissible:
 a. Employee-Plaintiff's W-2 from Mayflower Vehicle Systems, Inc., for the year 2004, marked as Plaintiff's Stipulated Exhibit 1;
 b. Employee-Plaintiff's medical records from Carolina Orthopaedic and Sports Medicine, Neuroscience and Spine Center of the Carolinas, Carolina Medical and Rehab Center, Therapy Plus, SpineCarolina, Southeast Pain Care, Boiling Springs Medical Associates, Pardee Hospital, Mecklenburg Diagnostic Imaging, and Mission Hospital, marked respectively as Plaintiff's Stipulated Exhibit 2-11.
 *********** ISSUES
1. Whether Employee-Plaintiff is entitled to compensation for days missed from work, payment of medical expenses, and payment for permanent partial disability benefits?
2. Whether Employee-Plaintiff is disabled, that being incapable of earning his pre-injury wage in the same or other employment, as a result of his compensable injury?
3. Whether Defendants are entitled to a credit for an overpayment of benefits that were paid after Employee-Plaintiff obtained suitable employment with Lipscomb's Used Cars?
 *********** *Page 4 
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. As of the date of hearing before the Deputy Commissioner, Plaintiff was 38 years of age, having a date of birth of September 17, 1969. He has a high school education and completed almost two years at Isothermal Community College in physical education.
2. Plaintiff has a history holding positions that require heavy labor. He worked as a material handler with Cone Mills from 1987 — 1988 supplying raw materials for machinery. He worked with Burlington Industries for ten (10) years as a machine operator and supervisor. Plaintiff began working on the assembly line with Mayflower Vehicle Systems in 1999.
3. On December 7, 2004, Plaintiff was working for Mayflower Vehicle Systems as a floater. As a floater he worked on different projects throughout the plant including assembly of New York City Garbage trucks and other large trucks and truck cabins. Most of Plaintiff's jobs were on the LE assembly line. Plaintiff's work as a floater included bulk framing, part assembly, placing roofing on trucks, welding, Ecoat loading, options and drilling, and sealing cracks in cabs. Plaintiff's job was a heavy duty job requiring him to lift up to 75 pounds regularly.
4. At approximately 3:30 p.m. on December 7, 2004, Plaintiff was called by his team leader, Mike Warren, to move an LE cab to the next process. Plaintiff got off of the tow motor to adjust the wheels on the truck skid. After he adjusted the front wheels, Plaintiff walked around to adjust the back wheels. While he was walking, Plaintiff slipped on an oil spill and fell landing on his back on the concrete floor. Plaintiff advised his supervisor of the fall.
5. Plaintiff sustained a specific traumatic injury to his back and left knee arising out of and in the scope and course of his employment as a result of the fall. As set out in Stipulated *Page 5 
Exhibit 2, the Defendants accepted this claim on a Form 60 for injury to Plaintiff's lower back and left knee. The Defendants have paid Plaintiff compensation for periods of temporary total disability and some medical expenses.
6. Plaintiff was initially treated by Dr. Timothy Sloand at Carolina Orthopaedic and Sports Medicine on December 8, 2004. Upon examination, Dr. Sloand diagnosed Plaintiff with an acute lumbar sprain and left knee contusion. Dr. Sloand prescribed pain medication and advised Plaintiff to rest during the weekend. Dr. Sloand released Plaintiff to return to full duty work as of December 13, 2004.
7. Plaintiff was seen again by Dr. Sloand on December 20, 2004, complaining of continued pain in his back. Dr. Sloand referred him for a lumbar MRI which was done January 17, 2005, and revealed a right para-median broad-based disc protrusion. Plaintiff was released from Dr. Sloand's care on January 26, 2005 for his left knee contusion and was referred to a neurosurgeon for further evaluation of his lumbar condition.
8. Plaintiff was then seen on referral for additional treatment for his back by Dr. William Hunter at Neuroscience and Spine Center of the Carolinas on February 18, 2005. On that date, Dr. Hunter confirmed that Plaintiff had a herniated right disc at the L5-S1 region. Dr. Hunter prescribed physical therapy, which Plaintiff attended from February 28, 2005 through April 13, 2005. Defendants have approved medical treatment rendered by Dr. Hunter as the authorized treating physician.
9. After completing his physical therapy program, Plaintiff returned to see Dr. Hunter on April 15, 2005, with continued complaints of pain. At this time, Dr. Hunter determined that it was reasonable to try some chiropractic treatment and referred Plaintiff to a chiropractor for additional care and wrote him out of work for four weeks. *Page 6 
10. Thereafter, Plaintiff sought chiropractic care from Dr. R. Scott Rash from May 31, 2005 through July 15, 2005. The chiropractic treatment did not bring relief to Plaintiff's pain complaints.
11. On August 31, 2005, Plaintiff returned to Dr. Hunter complaining of continued low back pain, hip pain, buttock pain, and right leg pain. Dr. Hunter recommended either oral medication or therapeutic injections. Plaintiff reported he wished to try medications before undergoing injections. Accordingly, Dr. Hunter prescribed Sterapred for 12 days. If Plaintiff did not improve, Dr. Hunter suggested that Plaintiff have an epidural steroid injection in the L-5/S-1 region. He also assigned light duty work restrictions of no lifting greater than 30 pounds.
12. On September 2, 2005, Dr. Hunter wrote a letter to the nurse case manager, Ms. Levonne Mitchell, stating his opinion that Plaintiff had reached maximum medical improvement. Dr. Hunter also assigned a five percent (5%) permanent partial impairment rating to Plaintiff's back. At that time, Dr. Hunter believed Plaintiff's back condition had stabilized.
13. Plaintiff initiated a trial return to work under Dr. Hunter's orders on September 2, 2005 as a light duty assembler, beginning at four hours per day and progressing to full time. Plaintiff's weight restriction was 30 pounds. In performing this job, Plaintiff continued to experience a lot of pain. He was placed in a lighter duty position involving cab preparation but the position still aggravated his injury.
14. Defendants filed a Form 28T dated 9/8/05, indicating that Plaintiff would be returning to work as of September 2, 2005. It appears this was the last date for which Plaintiff was paid for temporary total disability compensation. As of October 3, 2005, Dr. Hunter had released Plaintiff to return to full duty work. *Page 7 
15. Per the prior recommendations of Dr. Hunter, Plaintiff received epidural steroid injections from Dr. Richard Park of Southeast Pain Care, the first on October 7, 2005, and a second injection on October 31, 2005. These injections provided only minimal relief.
16. Plaintiff returned to Dr. Hunter's office on November 9, 2005, with continued complaints of pain. Dr. Hunter ordered that Plaintiff undergo a CT myelogram before he prescribed additional treatment. Dr. Hunter advised Plaintiff to return to his office once the CT myelogram was completed. At that time, Dr. Hunter did not believe surgery would be beneficial for Plaintiff.
17. Plaintiff underwent a CT scan myelogram on November 18, 2005. Dr. Hunter noted that the CT scan myelogram showed an abnormality at the L-5/S-1 region centrally located paracentral to the right side. Dr. Hunter indicated that it also showed a very mild bulge at L-3/4.
18. Plaintiff wanted a second opinion and went to see Dr. Hoski, at SpineCarolina on January 24, 2006. Dr. Hoski reviewed Plaintiff's CT scan myelogram and noted that it demonstrated degenerative disk disease at L1-2 and right central disk protrusion at L5-S1. After a comprehensive examination, Dr. Hoski noted that Plaintiff was a candidate for right L5-S1 micro lumbar diskectomy. The goal of surgery was to decrease pain, specifically his leg pain, and increase Plaintiff's level of function. Dr. Hoski wrote a note for Plaintiff to remain out of work until further notice.
19. Plaintiff returned to Dr. Hunter on February 28, 2006. At that visit, Dr. Hunter noted that Plaintiff had undergone a second opinion by Dr. Hoski, and that Dr. Hoski had stated that surgery would be the next step and the most benefit to Plaintiff. At this visit, Dr. Hunter indicated that he will "leave it up to the second opinion physician to care for him." *Page 8 
20. On March 3, 2006, Plaintiff filed a Motion to approve Dr. James J. Hoski as his authorized treating physician. Special Deputy Commissioner Elizabeth M. Maddox denied Plaintiff's Motion by Order filed July 19, 2006.
21. Plaintiff returned to Dr. Hoski and told Dr. Hoski that he wished to proceed with surgery. On March 29, 2006, Plaintiff filed a request for medical leave to begin March 29, 2006 and last until ten weeks after his surgery.
22. Dr. Hoski performed surgery on Plaintiff on March 30, 2006. The procedure was a right L5-S1 micro lumbar diskectomy. On March 31, 2006, Dr. Hoski noted that Plaintiff would be unable to work for approximately ten weeks. Defendants did not authorize the surgery, and have denied payment for the same.
23. On March 31, 2006, Dr. Hoski noted that Plaintiff would be unable to work for approximately ten weeks. Dr. Hoski referred Plaintiff for physical therapy, which he attended from May 23, 2006 through August 30, 2006.
24. On May 30, 2006, Dr. Hoski continued Plaintiff's out of work status until July 28, 2006. On July 28, 2006, Plaintiff was continuing to have some mid-back pain. Dr. Hoski instructed Plaintiff to remain out of work for an additional six weeks.
25. Post-surgery Plaintiff had decreased leg pain. He still complained of residual pain, primarily in his lower back. Dr. Hoski considered the surgery successful in relieving Plaintiff's leg pain. The medical treatment provided to Plaintiff by Dr. Hoski was of benefit in reducing Plaintiff's pain levels and lessening Plaintiff's impairment.
26. Although Dr. Hunter had mentioned surgery as a last option, he did not disagree that surgery could be appropriate. Per Dr. Hunter's testimony, once the conservative treatments *Page 9 
had failed to provide Plaintiff with pain relief, it was reasonable to proceed with surgery, as carried out by Dr. Hoski.
27. On September 15, 2006, Plaintiff returned for follow-up care to Dr. Hoski's office. Although Plaintiff complained of residual pain, Dr. Hoski determined that he had reached maximum medical improvement and assigned a ten percent (10%) permanent partial impairment rating to his back. Dr. Hoski released Plaintiff to return to medium duty work, with lifting restrictions of ten (10) pounds constantly, twenty-five (25) pounds frequently and up to fifty (50) pounds occasionally.
28. Due to his treatment by Dr. Hoski, Plaintiff was unable to earn wages in any employment from January 24, 2006 when Dr. Hoski removed him from work through September 2, 2006, when Dr. Hoski released Plaintiff to return to work. During this time, Dr. Hoski had removed Plaintiff from employment to facilitate his upcoming back surgery and recovery from back surgery.
29. Since the assessment of maximum medical improvement, Plaintiff has returned to see Dr. Hoski. On February 6, 2007, Plaintiff was seen by Dr. Hoski, complaining of midback pain, right-sided low back pain, right buttock pain, and some aching in his right thigh. Dr. Hoski advised Plaintiff that his condition did not require further surgery and restated his assessment that Plaintiff could work at a medium physical demand level.
30. Following Plaintiff's surgery, the Defendant-employer offered no positions to Plaintiff within Plaintiff's work restrictions. There were no attempts made to provide Plaintiff with vocational rehabilitation. Plaintiff has not returned to work at Mayflower and defendant-employer has not provided him with suitable employment that meets the medium demand level restriction initiated by Dr. Hoski. *Page 10 
31. In October 2005, Plaintiff established his own business selling used cars, which is known as Lipscomb's Used Cars. This is a very small business in which Plaintiff is the only salesperson and keeps only two to four (2 to 4) cars on his lot at any one time. In operating this business as sole proprietor, Plaintiff travels to auctions, purchases cars, and resells them at his car lot. He may also assist customers in financing their automobile purchases.
32. Plaintiff enjoys operating his own business, although he does not have a steady income stream. Plaintiff testified that he believes he has the skills necessary to be a successful used car salesperson and business owner. He further testified that he preferred working for himself rather than for another business, even though he may not earn as much income as a self-employed sole proprietor.
33. In a Form 90 dated November 5, 2007, Plaintiff reported that he earned a total of $11,740.72 working at Lipscomb's Used Cars since October 10, 2005. By contrast, Plaintiff earned an average weekly wage of $851.03 while working for Defendant-employer, which yields an annual income of $44,253.56.
34. In February 2008, Defendants employed a vocational rehabilitation specialist, Mr. John McGregor, to assist Plaintiff in finding suitable employment within his medium duty work restrictions. Mr. McGregor and Plaintiff met twice in March 2008. Per Mr. McGregor's testimony, the first meeting was for purpose of vocational assessment and the second meeting was to "nail down" a plan for further vocational services.
35. Plaintiff informed Mr. McGregor that he was running his own business, Lipscomb Used Cars. During these meetings, Mr. McGregor had positive impressions of Plaintiff as a nice and very friendly young man with a good personality, who was willing to work hard, a "super young man." Mr. McGregor testified that Plaintiff presented with the skills, personality, and *Page 11 
enthusiasm necessary for working as a car salesperson. The Full Commission noted the same positive impressions of Plaintiff at the hearing before the Deputy Commissioner. Plaintiff presents himself very well.
36. Mr. McGregor was not able to examine Plaintiff's books to determine how much income was coming in from his used car sales. However, it was apparently that it was not much money and Mr. McGregor recommended that Plaintiff consider working for another car dealer. In Mr. McGregor's assessment, Plaintiff would be "highly employable" at a new car or used car lot. Plaintiff refused to consider working for anyone else, stating that he preferred instead to work for himself. Plaintiff gave consistent testimony at the hearing before the Deputy Commissioner, that he preferred running his own small business.
37. Mr. McGregor did not believe that Plaintiff's physical work restrictions prevented him from returning to suitable employment, since many jobs for which Plaintiff was qualified, including selling cars, were light duty positions. Per Mr. McGregor, Plaintiff could also work in sales in some other industry. The U.S. national average salary for used car salespersons is $29,931, while the average in Rutherfordton is $25,797. Even if Plaintiff could earn wages in the range of $25,797 selling used cars, this is significantly below his pre-injury yearly earnings. Per this assessment, Plaintiff has suffered a diminution of his wage earning capacity of approximately $18,848 per year.
38. In assessing Plaintiff's wage earning capacity post-injury, the Full Commission has relied more upon the vocational assessment and evaluation provided by Mr. McGregor, rather than the more vague information of Plaintiff's actual wages earned in his own business of Lipscomb's Used Cars. While Plaintiff's information shows actual income based upon his *Page 12 
election to pursue his own business, Mr. McGregor's assessment is a more accurate measure of wage earning capacity.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On December 7, 2004, Plaintiff sustained a compensable specific traumatic incident arising out of and in the scope and course of his employment with Defendant-Employer while performing job duties. N.C. Gen. Stat. § 97-2 (6).
2. As a consequence of his work injury, Plaintiff sustained injury to his back, left knee and right leg, for which medical treatment was reasonably necessary, and for which Defendants are responsible for payment. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. The medical treatment provided to Plaintiff by the chiropractor, Dr. R. Scott Rash, as approved by Dr. Hunter, the authorized treating physician, was reasonable and should be approved. N.C. Gen. Stat. § 97-25.
4. The medical treatment provided by Dr. Hoski, including the back surgery, was appropriate and reasonably necessary to provide pain relief and improve Plaintiff's function and should be approved, and the request to approve Dr. Hoski as the authorized treating physician should be granted. N.C. Gen. Stat. § 97-25.
5. Due to his pending back surgery, and the reasonably necessary recovery time, Plaintiff was unable to earn wages in the same or any other employment and was temporarily totally disabled and is entitled to compensation at the rate of $567.38 per week from January 24, 2006 through September 2, 2006. N.C. Gen. Stat. § 97-29. *Page 13 
6. Plaintiff has reached maximum medical improvement and sustained a ten percent permanent impairment (10 % PPD) to his back for which he would be entitled to receive compensation for thirty weeks pursuant to N.C. Gen. Stat. § 97-31(23).
7. Due to his injury of December 7, 2004, and the permanent impairment from said injury and his lifting restrictions, Plaintiff is unable to return to employment at his pre-injury wages, and has sustained permanent partial impairment. N.C. Gen. Stat. § 97-30.
8. Plaintiff has suffered a diminution in his wage earning capacity of approximately $18,438 per year, or $354.57 per week. Therefore, Plaintiff may elect to receive compensation for temporary partial disability at the rate of sixty-six and two-thirds percent of the difference between his pre-injury wage of $851.03 and his potential post-injury wages of $354.57 for up to 300. This difference of $496.46 would result in compensation of $330 per week for up to 300 weeks. This is the more favorable remedy rather than payment of compensation for his ten percent permanent impairment rating to his back. N.C. Gen. Stat. §§ 97-31(23), 97-30.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Dr. Hoski is approved as an authorized treating physician for the injuries sustained by Plaintiff in the accident of December 7, 2004.
2. Defendants shall pay for medical expenses incurred as a result of Plaintiff's compensable injury of December 7, 2004, including the treatment rendered by Dr. Hoski, and the chiropractor, Dr. R. Scott Rash, as the same was reasonably necessary to effect a cure, provide relief, or lessen the period of disability. *Page 14 
3. Defendants shall pay Plaintiff compensation at the rate of $567.38 per week for the period of January 24, 2006 through September 2, 2006 as temporary total disability.
4. Defendants shall pay Plaintiff compensation at the rate of $330 per week for up to 300 weeks, as compensation for his permanent partial impairment under N.C. Gen. Stat. § 97-30. Said payments shall commence as of September 3, 2006.
5. All compensation accrued to date shall be paid in a lump sum, subject to the attorneys' fee.
6. A reasonable attorneys' fee of twenty-five percent of Plaintiff's compensation for temporary total and permanent partial disability benefits is approved for and shall be paid to Plaintiff's counsel. Twenty-five percent of accrued benefits shall be paid to counsel and thereafter every fourth check shall be paid to Plaintiff's counsel.
7. Defendants request for a "credit" for "overpayment" of benefits after Plaintiff began his business of selling used cars is granted, and a credit of $11,740.72 shall be allowed as to payments of compensation for permanent partial impairment under N.C. Gen. Stat. § 97-30.
8. Per the agreement of the parties as set out in the Pre-trial Agreement, Defendants shall be granted a "credit" of $416.25 against the benefits paid to Plaintiff for payment of the Plaintiff's portion of the mediation fees.
9. Defendants shall pay the cost, including expert witness fees of $900 to Dr. Hunter, $825 to Dr. Hoski, and any fees charged by John McGregor.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 15 
CONCURRING:
 S/_____________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ PAMELA T. YOUNG CHAIR